.J. G. CHOUTEAU, ADMINISTRATOR, ET AL., Appellants,
v. THE UNION RAILWAY AND TRANSIT COMPANY ET
AL., Respondents.

**St. Louis Court of Appeals, May 11, 1886.**

1. EQUITY—MANDATORY INJUNCTION—SPECIFIC PERFORMANCE.—A mandatory injunction may lie to enforce a continuing obligation, in cases where the courts would not decree specific performance of the obligation.

2. ———— Equity will not interfere by mandatory injunction to enforce a continuing obligation, which is so uncertain and indefinite in its terms as to make it necessary to resort to conflicting evidence *aliunde*, to determine the intent of the parties.

3. ———— CONTRACTS—COMMON CARRIERS,—A contract by a common carrier, which disables it to perform its duty to the public, will not be enforced.

4. ———— DISCRIMINATION.—Courts of equity, in order to enforce the statutes against discrimination by common carriers, must be fully satisfied that its orders will not likewise work a discrimination.

APPEAL from the St. Louis Circuit Court, ELMER
B. ADAMS, Judge.

*Affirmed.*

DYER, LEE & ELLIS, for the appellants: If it be
true that this is a case where the affirmative specific performance of the contract is beyond the power of the
court, its performance will be negatively enforced by enjoining its breach. *Western Union Telegraph Co. v·
Railroad*, 3 Fed. Rep. 429; s. c., 1 McCrary's Rep. 564.
The Supreme Court of the United States has expressly
held in favor of compelling specific performance of the
contract of a railroad company to give railway service.
*Express Company v. Railroad*, 99 U. S. 191. "Judge
Story, after an elaborate examination of the subject,
thus lays down the general rule: 'The just conclusion

in all such cases would seem to be that courts of equity ought not to decline the jurisdiction for a specific performance of contracts whenever the remedy at law is doubtful in its nature, extent, operation, or adequacy.'" *McPike v. West*, 71 Mo. 199; see, also, *Vincent v. Railroad*, 49 Ill. 34; *Lathrop v. Railroad*, 4 Fed. Rep. 47; *Dinsmore v. Railroad*, 3 Fed. Rep. 603; 2 Redfield on Railroads (4 Ed.) 355–356; *Singer Co. v. Union Co.*, 1 Holmes R. 256, opinion by Lowell, C. J.; *Jones v. North L. R.*, 19 E. Q. 426; *DeMattos v. Gibson*, 4 DeG. and S. 276, 299; *Frank v. Bruneman*, 8 W. Va. 462; *Rankin v. Husinkson*, 4 Sim. 13; *Mining Co. v. Water Co.*, 1 Sawyer 470–585 (see remarks of Justice Field); Pomeroy on Specific Performance, sects. 24, 25, 310, 311, 312; 15 Fed. Rep., No. 9, May 8, 1883; *Railroad v. Railroad*, 24 Fed. Rep. 520; *Wells, Fargo Co. v. Railroad*, 16 Am. and Eng. Railroad Cases 71; *Wells, Fargo Co. v. Railroad*, 18 Am. and Eng. Railroad Cases 441.

S. M. BRECKINRIDGE, M. F. WATTS, and D. C. BRECKINRIDGE, for the respondents: Specific performance will not be decreed unless the terms of the contract are clear, definite, and positive, and a greater degree of certainty is required in an agreement which is to be specifically enforced in equity than is required in a contract which is to be the basis of an action at law for damages. Nor will specific performance be decreed where the duties sought to be enforced are of a continuous character. The following authorities support the foregoing propositions, in their application to facts similar to those in the case at bar: Pomeroy on Contracts, sects. 157, 159, 160, 308, 312; Fry on Specific Performance, 154; *Blanchard v. Railroad*, 31 Mich. 43; *Railroad v. Speer*, 82 Ga. 550; *Wilson v. Railroad*, 9 Ch. Ap. 279; *Richmond v. Railroad*, 33 Iowa, 422; *Powell Coal Co. v. Railroad*, 9 Ch. Ap. 331; *Danforth v. Railroad*, 30 N. J. Eq. 12; 2 Tenn. Ch. R. 773. In

determining whether specific performance should be decreed, regard must be had to the rights of the public. *Marsh v. Railroad*, 64 Ill. 415; *Raphael v. Railroad*, 2 Law Rep., 2 Eq. Cases, 37. The right granted by the public to construct and operate this railroad, involves the reciprocal duty to keep it unencumbered by private rights or easements of a permanent nature, which would materially impair its usefulness to the public. *Jackson & Sharp Co. v. Railroad*, 11 Am. Law Reg. (N. L.) 377-8; *Heyl v. Railroad*, 51 Pa. 469; *Pitkin v. Railroad*, 2 Barb. Ch. Rep. 221. This duty to the public can not be divested by contract or otherwise. *Railroad v. Coal Co.*, 68 Ill. 489; *Railroad v. People*, 56 Ill. 366; *Railroad v. Seely*, 45 Mo. 212; *Express Co. v. Railroad*, 57 Me. 188; *The State v. Railroad*, 29 Conn. 538.

ROMBAUER, J., delivered the opinion of the court.

The plaintiffs filed their petition in the trial court, by which they sought to reform the contract hereinafter set out, and to obtain a mandatory injunction compelling the defendants to perform the contract thus reformed, and also restraining them from discriminating as common carriers against the plaintiffs.

A temporary injunction was applied for by the plaintiffs, which the court refused to grant. The parties thereupon went to trial upon the petition, answers, and replies hereinafter referred to, and the court, after a protracted hearing, made its decree, reforming the contract as prayed for in the plaintiffs' petition, but declined to grant any further relief. From this decree the plaintiffs appeal.

In order to convey a correct understanding of the issues tried and determined, it is essential to set out the plaintiffs' petition in full, as well as the substance of the various answers filed by the defendants.

The petition avers that all the defendant companies

were railroad companies organized under the general laws of this state, and that, on the twenty-fifth day of July, 1874, The Union Railway and Transit Company was operating a line of railroad from the Union depot in St. Louis through the tunnel and across the bridge which here spans the Mississippi river.

That, on the date last aforesaid, the plaintiffs N. Sylvester Chouteau and J. Gilman Chouteau were the owners of a portion of block four hundred and thirty-seven in said city, which is situated between Eleventh and Twelfth streets, and near to Poplar street, in said city ; that they were, also, the owners of a warehouse, located on said block, near the Union depot grounds, and near the freight depot of the defendants ; that the chief value of the plaintiffs' property consisted in its convenience for the construction of warehouses for the receipt and handling of freight to be transported over the defendant's lines of railroad ; that, at the last named date, the terminal point of the defendant's line was distant from said block belonging to said Chouteaus, just the space across Eleventh street ; that, on said date, the other plaintiffs were engaged in business in St. Louis as warehousemen and commission merchants, under the name of Evans Brothers, and their place of business was at the warehouse aforesaid, on block four hundred and thirty-seven, which was then occupied by them as lessees of the Chouteaus, their co-plaintiffs.

That all the plaintiffs, except James W. Evans, were at said date and up to the suspension of the cotton business in the petition afterwards mentioned, also engaged in business at said city as warehousemen and commission merchants, under the name of Evans Brothers Cotton Compress Company, in storing, handling, buying, and selling cotton, and using in connection with such business a cotton compress of the value of $25,000, said compress being located on said block four hundred and

thirty-seven, convenient to said warehouse and to defendant's line of railway ; that for the purpose of increasing the facilities and conveniences of the plaintiffs in the different kinds of business in which they were engaged, as aforesaid, at said block, as well as for the purpose of increasing the traffic over the defendant's line of road, the following agreement was on said last date, to-wit: the twenty-fifth day of July, 1874, entered into by the defendant, The Union Railway and Transit Company of St. Louis :

" Articles of agreement entered into this twenty-fifth day of July, A. D. 1874, by and between The Union Railway & Transit Company of St. Louis, a corporation, and J. Gilman Chouteau and N. Sylvester Chouteau, of the same place. Whereas the said J. Gilman Chouteau and N. Sylvester Chouteau have, by a certain agreement of even date herewith, granted to the said The Union Railway & Transit Company of St. Louis certain rights and privileges, among others, the right to lay and use railway tracks on and across Eleventh street in said city, in front of their property ; now, therefore, in consideration thereof, the said The Union Railway & Transit Company of St. Louis, does hereby agree to and with said J. Gilman Chouteau and said N. Sylvester Chouteau that they shall have the right to connect with the tracks of the said The Union Railway & Transit Company of St. Louis, the tracks of The Evans Tobacco, & Cotton Compress Company, of which J. Gilman Chouteau and N. Sylvester Chouteau are members, and which purposes to locate its warehouse in city block four hundred and thirty-eight, of said city of St. Louis, by laying and maintaining not more than two (2) tracks and connecting the same with said tracks of The Union Railway & Transit Company of St. Louis, on said Eleventh street, not more than two hundred (200) feet north of the north line of Poplar street, and the said The Union Railway & Transit Company of St. Louis

does hereby agree to and with said J. Gilman Chouteau and said N. Sylvester Chouteau that it will carry freight and cars on and over said tracks, and generally do the freighting on the same of the said The Evans Tobacco and Cotton Compress Company on the same terms and at the same rates on and at which similar service is performed for other parties by it.

"In testimony whereof, the said The Union Railway & Transit Company of St. Louis has caused these presents to be executed in due form by its president and attested by its secrerary, the day and year first above mentioned.

"THE UNION RAILWAY & TRANSIT
"COMPANY OF ST. LOUIS,
"By W. H. CLEMENTS,
"*President.*"

Copy of Seal:
[THE UNION RAILWAY & TRANSIT COMPANY.]

Which said contract was by the defendant company duly acknowledged and recorded in the city of St. Louis ; that it was then agreed and understood, for the consideration expressed in said contract and for other good considerations, that such contract should continue for the term of fifty years ; that all of the plaintiffs, except James W. Evans, who afterwards became a member of the firm of Evans Brothers, were intended and meant and were included in the name "Evans Tobacco & Cotton Compress Company," mentioned in said contract, and that the tobacco and the cotton, and other commission and warehouse business, in which the plaintiffs were differently interested, as thereinbefore set out, were intended to be expressed by, and included in, the name "Evans Tobacco & Cotton Compress Company."

The petition further recites that, by the mutual mistake of the parties to the contract, block four hundred and thirty-seven was called four hundred and thirty-eight. The petition prays that this mistake be corrected

and the contract in this regard reformed so as to make it read four hundred and thirty-seven. The petition also avers that, by reason of the contract and in pursuance of the terms thereof, the Chouteaus located the warehouse, as by said contract meant and intended, on block four hundred and thirty-seven, and constructed said warehouse on the extension of, or the switch from, defendant's line of railroad, proposed by said contract, so that loaded cars could be run into said warehouse and there unloaded and reloaded ; that the expense of the construction of this warehouse was $10,000, paid by the plaintiff ; that at the same time the tracks called for by said contract were laid by the defendant, The Union Railway & Transit Company, extending, as by the contract required, from the point on Eleventh street, across that street and into plaintiffs' warehouse, so that cars or freight consigned to plaintiffs, or either of them, by the names mentioned in said contract, by the said firm name or by any other name, could be run by the defendant over said extension track into and from the warehouse.

That on or about October 1, 1874, said warehouse was completed and leased to the plaintiffs, the Evans Brothers, who then went into occupation of the same and that they are still in occupation thereof ; that the Chouteaus were induced to erect and construct said warehouse, only by reason of the railroad facilities to be afforded their lessee, and in leasing the same to the Evans Brothers, the Chouteaus exacted a rent from them far greater than would have been required without the railway service contracted for ; and that said tenants, in making their contract with the Chouteaus for the tenancy of the warehouse, were only induced to do so because of the railroad facilities to be afforded them under said contract.

The petition further recites that on the first day of January, 1879, The Union Railway & Transit Company of

St. Louis leased for ninety-nine years to the St. Louis Bridge Company and the Tunnel Railroad all the property of said lessor, including the track running into plaintiffs' warehouse ; and that these lessees had knowlledge of the contract aforesaid.

The amended petition recites that since the institution of this suit, the St. Louis Bridge Company and the Tunnel Railroad Company of St. Louis have leased all of their property, including the track running into plaintiffs' warehouse, to the Wabash, St. Louis & Pacific Railway Company and the Missouri Pacific Railway Company for the unexpired term of their lease ; and that the latter companies did assume all the obligations imposed upon their lessors and, also, the obligations of this contract.

That in accordance with the requirements of said contract, The Union Railway & Transit Company did, between the first day of October, 1874, and the date of its lease, and that thereafter it lessee did, until the twenty-fifth day of July, 1879, successively give the plaintiffs the railway service over said railway tracks required by them and did, over such extension track or switch; carry feights and cars into and from the plaintiffs' warehouse ; and that said track did become a part of the defendants' lines of railway, and that said warehouse became and was and is located on the defendants' line of railway.

The petition further avers that by reason of the convenience and capacity of plaintiffs' warehouse, and by reason of the defendants having faithfully carried out their contract, the plaintiffs built up a large and profitable business as warehousemen and commission merchants, and their warehouse had become a popular and usual place for storing and dealing in cotton, tobacco, and other commodities, out of which plaintiffs were realizing large profits.

That since the last named date, to-wit, July 25, 1879, the defendant companies have violated their

contract and agreement to carry freight into the plaintiffs' warehouse, as required by said contract and, although often requested, have refused to haul and deliver cars over their said line consigned to the plaintiffs in their warehouse.

That it has been and is usual and customary for all the railroads in the city of St. Louis, including the defendants, to permit connection to be made with their lines by switches or branches to elevators or warehouses; and to haul and transport cars over the same, making a delivery to such elevators and warehouses; and that this has always been the usage and custom of the defendants, and still is, except against these particular plaintiffs and their warehouse aforesaid .

That the defendants have unlawfully discriminated against the plaintiffs and their warehouse and their business as commission merchants, in favor of other warehousemen and others doing a commission business.

The petition states that, by reason of such refusal and breaches of contract, the plaintiffs were greatly and irreparably injured in their business; that their trade fell off, and owing to their inability to obtain railroad service business destined to them was diverted, resulting in a daily loss of profits and a constant diminution in their business; and, as to a portion of their business, the plaintiffs have, in consequence of said refusal, been compelled to abandon such business; that they have been compelled to haul all the freight they received from the defendants' warehouse to the plaintiffs' warehouse by wagons and horses; that such method of transportation is slow, uncertain, and unsatisfactory to shippers and dealers; and that it is impossible for the plaintiffs to compete with other warehouses, to which the defendants have been and are giving railroad facilities.

That the plaintiffs' injuries and destruction of business could not be adequately or fairly compensated by damages which might be recovered in a suit at law; that

the breaches of contract by the defendants occur every day and have occurred since July 25, 1879; that the defendants threaten to continue and proceed in their refusal to perform the service in said contract and threaten to continue to discriminate against them.

The prayer of the petition is as follows: "Wherefore, plaintiffs pray the court, by its decree, to order, require, and compel the defendants to carry out, conform to, and comply with, the terms of said contract, agreements and obligations, and to fulfil and execute the duties required of them by law, and to enjoin and restrain the defendants from delivering freight or cars consigned to plaintiffs, or either of them, in their individual names, or under the firm name of Evans Brothers, or Evans Brothers Cotton Compress Company, at any freight depot or other point on lines of their railroad, except the warehouse of plaintiffs so erected on the line of defendants' road, and that they be enjoined and restrained from refusing to receive at plaintiffs' warehouse, freight and cars destined for transportation on or over defendants' lines of road, and from refusing to transport the same across said Eleventh street, as required by said contract and by law; and that a temporary injunction may now be awarded herein, enjoining and restraining the defendants as herein prayed."

This petition was sworn to by one of the plaintiffs.

The answer of The Union Railway & Transit Company, in addition to a general denial, avers that during the time that company performed service for the plaintiffs' warehouse, it was done in pursuance of its business as a common carrier, and not under or in pursuance of any contract; that since December, 1878, the freight traffic over its line had increased to such an extent that it was wholly impossible to transport cars to and from the plaintiffs' warehouse over the switch across Eleventh street, and at the same time perform and discharge its duties to the public.

The answer of the St. Louis Bridge Company, in addition to a general denial, avers that whatever service it rendered to the plaintiffs, was in pursuance of its duty as a common carrier; that it was, up to the date of its lease to the Wabash and the Missouri Pacific, wholly impossible for said defendant to perform the service claimed by the plaintiffs, and at the same time discharge its duties to the public; and that it has not now any railroad track by which it could render the plaintiffs the service asked for.

The answer of the Tunnel Railroad of St. Louis is identical with the answer of the St. Louis Bridge Company.

The answer of the Wabash, and of the Missouri Pacific, in addition to a general denial, sets up that neither of said companies had any notice of a contract set out in the petition, nor have they ever recognized the same as valid in any way; that said contract never was valid, because it was made without any valuable consideration, and because it does not purport to continue for any definite length of time; and that whatever service had been performed by the said defendants had not been under said contract, but in pursuance of their business as a common carrier; that owing to the situation of the plaintiffs' warehouse, it has been, and is, impossible to give the plaintiffs the service claimed, by reason of its being hazardous and endangering the safety of trains, and of the traveling public.

To each of the answers aforesaid the plaintiffs, by way of reply, filed a general denial.

The defendants maintained in the trial court, and do maintain here: (1) That the contract of The Union Railway & Transit Company was one with J. Gilman Chouteau and N. Sylvester Chouteau, and that all the Evans plaintiffs are improper parties plaintiff. It is needless to determine whether there is any merit in that objection, as it was not made in the court below, as required by Re-

vised Statutes, section 3515, and as the fact that the Evans plaintiffs are not entitled to any relief, would not necessarily debar the Chouteau plaintiffs from relief likewise.

It is next maintained by the defendants that the contract sought to be enforced is lacking in that certainty and definiteness which will justify a court of equity in decreeing its specific performance. That this uncertainty is very marked in the following particulars : It contains no provision relative to the duration of the contemplated service, and there is nothing to show on its face, whether it is to continue during the corporate life of the contracting defendant, or whether it is to be determinable at the will of either party, or whether it is to continue as long as the condition of things remains unchanged and the plaintiffs may require the service, nor is there anything to show what the words "similar service for other parties" by the contracting carrier mean—whether such words mean switch service in general, or service in moving cars and freight of similar intrinsic difficulty.

The plaintiffs, in order to supply these omissions and this want of definiteness, appearing on the face of the contract, introduced testimony tending to show that there was no limit to the contract. One of the plaintiffs testified that the president of the contracting defendant stated to him that he would give them this railroad service as long as they acquired a corporate existence. In order to supply the omission in regard to the rates at which similar service is performed for other parties, the plaintiffs introduced testimony tending to show that there was a uniform schedule of switch charges to all of the warehouses in the city of St. Louis, and that their uniformity was irrespective of the location or difficulty of access, or length of switch to the different warehouses. At the same time, however, the plaintiffs did further show that, by contract between some of the defendants and the Union Depot Storage & Shipping Company, the latter

corporation obtained switching rates much lower than the schedule rates charged other warehouses.

On the other hand, the defendants gave testimony tending to show that there is great difference in the cost of switching, and that the rule as to charges varies with each particular case; that the service demanded by the plaintiffs is very expensive, and the service demanded by the Union Depot Storage & Shipping Company is attended with very little difficulty.

Conceding, for the sake of argument, that the first difficulty in the way of specifically enforcing the contract, namely, its duration, is removed by the testimony, yet it is evident that sufficient other elements of uncertainty remain to justify the court in declining its specific enforcement. The right to specific performance is never absolute, but depends on the proper exercise of a sound judicial discretion as applied to the particular facts, and one of the well established principles in such cases is that the subject of the contract should be clearly ascertained to the satisfaction of the court which is called upon to decree its performance. *Paris v. Haley*, 61 Mo. 461; *Taylor v. Williams*, 45 Mo. 80, 84.

The weight of authority inclines to the rule that specific performance will not be decreed where the duties sought to be enforced are of a continuous character, even though the duties be clear and well defined. Where such duties are not only continuous, but at the same time uncertain and undefined, it can not be granted on any rational hypothesis. Pomeroy on Contracts, sects. 157, 159, 160, 308, 312; Fry on Specific Performance, 154; *Blanchard v. Railroad*, 31 Mich. 43; *Railroad v. Speer*, 32 Ga. 550; *Wilson v. Railroad*, 9 Ch. App. 279; *Richmond v. Railroad*, 33 Ia. 422; *Powell Coal Co. v. Railroad*, 9 Ch. App. 331; *Danforth v. Railroad*, 30 N. J. Eq. 12; 2 Tenn. Ch. 773. The plaintiffs' counsel contends that this is not a bill for specific performance, but one for a mandatory injunction, and that the latter will

lie, although the case may not be a proper one for specific performance.

That the violation of a contract requiring continuous duties may be enjoined, although a court of equity would not decree its specific performance, is a proposition which is sustained by authority. *Lumley v. Wagner*, 1 DeG. M. & G. 616; *Railroad v. Railroad*, 5 DeG. & Sm. 138; *Western Union Telegraph Co. v. Railroad*, 1 McCrary, 558; *Singer Co. v. Union Co.*, 1 Holmes, 256. But neither reason nor authority goes to the extent that a court of equity will enjoin the violation of a contract, or compel its performance by mandatory injunction, when its terms are so uncertain and indefinite as to be incapable of accurate formulation. It is difficult to see how, under such circumstances, an intelligent decree could be framed, or how the court could ever determine whether its injunction has been violated by the party enjoined. All that can properly be done in such a case, is to remit the parties to their legal remedy for damages caused to them by the violation of the contract.

A further claim was advanced by the defendants, to the effect that a compliance on their part with the contract, as claimed by the plaintiffs, would, in a great measure, prevent the performance of their duties as common carriers to the public.

On that subject the law is well settled. The principle is, that where a railroad company has granted to it, by its charter, a franchise intended, in a large measure, to be exercised for the public good, the due performance of those functions being the consideration of the public grant, any contract which disables the corporation from performing these functions is void and against public policy. *Thomas v. Railroad*, 101 U. S. 83; *Railroad v. Seeley et al.*, 45 Mo. 212, 219; *Marsh v. Railroad*, 64 Ill. 414; *Railroad v. Coal Co.*, 68 Ill. 489; *The State v. Railroad*, 29 Conn. 538; *Express Co. v. Railway*, 57 Me. 188, 196.

It is true that courts should cautiously scrutinize a

defence of this character, so as to prevent common carriers from repudiating an inconvenient contract under the pretense that its performance can not be harmonized with their public duty. In the present instance, however, the probabilities are that the defence is not a mere subterfuge, but rests upon a substantial foundation.

It appears, from the testimony, that all the freight coming from the east passes through a long tunnel on one main track; that the switch connecting with the plaintiffs' warehouse emanates from this main track at the western opening of the tunnel, and that this switch can only be operated at the expense of cutting off travel through the tunnel during its operation. There was evidence tending to show that the operation of the switch under these circumstances is attended with delay and extra expense to the railroad, and with more or less danger to passengers and operatives.

The plaintiffs, in rebuttal of this evidence, offered to show that the defendants entered into a stipulation with them by which they agreed to render the service which the plaintiffs claim they are entitled to over the track across Eleventh street into the plaintiffs' warehouse, by car or by wagon, during the pendency of the controversy. This stipulation the court excluded, but at the same time it permitted one of the plaintiffs to testify that such service was rendered, during a great part of the time, per car. The exclusion of this stipulation is complained of by the plaintiffs.

As the stipulation expressly provides that the service might be rendered either by car or by wagon, and that it was made without prejudice to the rights or claims of the parties thereto, and as the court, moreover, permitted the plaintiffs to show, not what the defendants agreed to do, but what they actually did do, we can not see how the plaintiffs were prejudiced by the exclusion of the stipulation.

Nor is there any force in the plaintiffs' argument that if the arrangement of the defendants' switch facili-

ties was of a character disabling them from performing their contract with the plaintiffs without detriment to their public duties, that then it was the duty of the defendants to condemn additional ground to enable them to perform said contract with convenience.

Conceding that such course would be practicable, which, owing to the situation of the property, is exceedingly doubtful, yet, it must be evident that such condemnation would not be for a public use, but for the sole purpose of enabling the defendants to perform a private contract, and as such, to say the least, a very questionable exercise of the right of eminent domain.

We have referred to the foregoing for the purpose of showing that the court tried the case, in all respects, judiciously and with care. As far as any rights of the plaintiffs, under the contract, are concerned, we prefer to rest our decision on the controlling proposition that the contract is not sufficiently definite and certain in its details to admit justly of a decree specifically enforcing it, or of a decree negatively enforcing it, by preventing its violation by mandatory injunction.

The question still remains, whether, independent of the contract, the court erred in refusing to the plaintiffs a mandatory injunction, preventing the defendants from discriminating against the plaintiffs in charges for freight delivery. Our statute, Revised Statutes, section 591, provides, among other things, that no railway company shall hereafter make any discrimination in charges or facilities in the transportation of freight or passengers between transportation companies or individuals, nor in the transportation of freight between commission merchants or other persons engaged in the transportation of freight, etc.

It further provides, "that any corporation, etc., violating the provisions of this section shall forfeit and pay to the injured party the whole amount of such transportation charge, to be recovered before any court of competent jurisdiction."

Now, the plaintiffs claim that the testimony in this case shows that the defendants have discriminated against the plaintiffs in freight charges, as compared with other warehouse men, and particularly as compared with the Union Depot Storage & Shipping Company, to whom, as the testimony shows, the defendants grant more favorable terms than to any other warehouse men or storage company within the city.

The court is asked to decree that the defendants be required to grant to the plaintiffs the same service, and at the same rate, as the Union Depot Storage & Shipping Company enjoys.

That the statute has never contemplated that the aid of courts of equity should be invoked for the purpose of violating its provisions, is self-evident. If the terms granted to the storage company are an unlawful discrimination against the plaintiffs and all others, the court, in enforcing the same terms in favor of the plaintiffs, would discriminate in favor of the plaintiffs against all others but the storage company.

Nor can the court in this, or any similar proceeding, regulate all freight charges between the carriers and their customers. Entertaining the greatest respect for the eminent judge who, on the circuit bench, decided the case of the *Southern Express Co. v. Railroad* (10 Fed. Rep. 215), we are yet free to say that, in our opinion, the learned district judge was right when he said, by way of dissent, that "it is beyond the powers and functions of the courts to hold, practically, under their control the administration of railroad affairs as to freight and other business."

Whether the remedy pointed out by the statute is necessarily exclusive, may be questioned, but that the court, under the facts developed by the testimony in this case, can not, and ought not, to grant to the plaintiffs the relief they seek, is, in our opinion, free from doubt.

It results that the decree of the trial court must be affirmed. All the judges concurring, it is so ordered.