FRED J. BURGER ET AL., APPELLANTS, V. CITY OF BEATRICE, NEBRASKA, A MUNICIPAL CORPORATION, ET AL., APPELLEES.

147 N.W. 2d 784

Filed January 6, 1967. No. 36292.

Asa A. Christensen and Clayton K. Yeutter, for appellants.

Anne P. Carstens and Perry, Perry, Sweet & Witthoff, for appellees.

Stewart, Calkins & Duxbury and David L. Crawford, for amicus curiae.

Heard before WHITE, C. J., CARTER, SPENCER, BOSLAUGH, SMITH, and McCOWN, JJ., and BOYLES, District Judge.

CARTER, J.

Plaintiff landowners brought this action to enjoin the City of Beatrice from proceeding in eminent domain to take restrictive easements over their lands for the installation of water wells and the withdrawal of ground water from beneath the surface of their lands. The trial court denied an injunction and the plaintiff landowners have appealed.

The evidence shows that in the fall of 1964, the City of Beatrice maintained a water distribution system for the inhabitants of the city. It operated 4 water wells in a well field 6 or 7 miles northwest of the city in an area near the Big Blue River. These wells, referred to in the record as wells Nos. 1, 2, 3, and 4, are located on the right-of-way of the Chicago, Burlington & Quincy Railroad, running in a northwest-southeast direction. The railroad right-of-way crossed the lands of plaintiffs. The wells were spaced 1,100 feet apart and were manned with pumps and two 14-inch pipelines which transported

the water to the city of Beatrice. The wells and water mains had the capacity to produce and deliver 6,000,000 gallons of water per day to the city. It was determined by the city prior to the events instigating this litigation that the maximum water needs of the city were inadequate even though the city was able to provide the water needs of the city and its inhabitants in 1964.

In 1964 and following, the Phillips Petroleum Company and the Cominco Products Company established fertilizer plants approximately 6 miles northwest of Beatrice near the unincorporated village of Hoag and near the water mains located between the city of Beatrice and its existing well field. Hoag is less than 1 mile southeast of the well field. On February 3, 1965, Phillips entered into a contract for the purchase of water from the city for the use of the new plant. This contract provided for the delivery of an estimated average of 50,000,-000 gallons of water per month with a maximum of 90,000,000 gallons per month. At the time of trial, a similar contract with Cominco was near completion. The negotiations indicated that Cominco required an average usage of 35,000,000 gallons of water per month with a maximum of 90,000,000 gallons per month.

With the foregoing situation existing, the city determined that a need existed for the extension of its well field by 4 wells. On March 19, 1965, the city entered into a contract with the Chicago, Burlington & Quincy Railroad by which it obtained an easement to install new wells on the railroad right-of-way. The final plan of the city was to extend its existing line of wells to the northwest with 1,100-foot spacing from well 4, the farthest northwest well of the existing wells. The plan required the easements here sought to permit the withdrawal of water by the pumps installed from the ground waters underlying plaintiffs' lands. To obtain these easements, the city negotiated with the plaintiffs and, failing this, the city instituted the condemnation proceeding here involved on April 8, 1965. On April 22, 1965, this action

was commenced to enjoin the condemnation proceedings for the reasons hereinafter discussed.

The evidence shows that Phillips and Cominco are private corporations engaged in the production of commercial fertilizers for profit. It also shows that the water requirements of these two companies will equal or exceed the previous requirements of the city of Beatrice. On the foregoing facts it is urged that the condemnation proceeding is for a private purpose and not a public purpose as required by the law of eminent domain.

It is first urged by the city that injunction is not a proper remedy for the reason that plaintiffs have an adequate remedy at law. The rule is: This court is committed to the rule that injunction is a proper action in which to present the question of unlawful or improper exercise of the power of eminent domain. Consumers Public Power Dist. v. Eldred, 146 Neb. 926, 22 N. W. 2d 188; Heppe v. State, 162 Neb. 403, 76 N. W. 2d 255.

The power of eminent domain is a sovereign power which exists independent of the Constitution of Nebraska. The Constitution of Nebraska and legislative enactments pursuant thereto are in no sense a grant of power, but are and should be treated as a limitation of the power of eminent domain. Consumers Public Power Dist. v. Eldred, *supra*. The Legislature may limit the sovereign power of eminent domain but it lacks the power to extend it. The absolute power of the sovereign authority to take private property for a public use has been limited by the Constitution of Nebraska by subjecting the taking to the payment of compensation for the land taken and the damages to property not taken. Art. I, § 21, Constitution of Nebraska. But it is essential that a use under the power of eminent domain must be a public use, and whether or not the use is public or private is a judicial question and not a legislative one.

A city in engaging in the production and distribution of water for the benefit of its inhabitants is engaged in a

proprietary capacity rather than a governmental one. The distinction between its governmental status and its proprietary capacity have been made in the past by this court. In Henry v. City of Lincoln, 93 Neb. 331, 140 N. W. 664, 50 L. R. A. N. S. 174, this court in dealing with the nature of the city's proprietary capacity said: "It is no part of its duty, as a municipal corporation, to engage in a purely business or commercial enterprise. When it seeks and obtains from the legislature permission to engage in such an enterprise, its act in so doing is purely voluntary on its part, and it thereby assumes a third relation, separate and distinct from the dual relations above considered. While occupying this third relation no governmental functions or corporate duties, as a municipality, devolve upon it. It is then engaged in an ordinary business enterprise, and is bound by all the rules of law and procedure applicable to any other private corporation or person engaged in a like enterprise. It has no greater or higher privileges or immunities than are possessed by any other private corporation." See, also, Incorporated Town of Sibley v. Ocheyedan Electric Co., 194 Iowa 950, 187 N. W. 560.

When it assumes the status of a private utility company in the production and distribution of water for the benefit of the inhabitants of the city, it subjects itself to the same rights and liabilities of a private water company. When it engages, therefore, in a public utility business, it must provide water service to all inhabitants alike who desire it at the same rate for the same service.

It cannot properly be said, and it is not here contended, that the production and distribution of water as above stated is not for a public purpose. Nor can it be said, and it is not here contended otherwise, that the city does not enjoy the right of eminent domain, both within and without the limits of the city, for the purpose of providing an adequate water supply to provide the needs of the city and its inhabitants. The question here raised is whether or not the taking of easements for water to sup-

ply users outside the corporate limits of a city is for a public or private purpose. The question is one of first impression in this state.

The Legislature has power over the very life of a city. It may limit or expand existing powers, or it may destroy the corporate powers of the municipality completely. In the instant case, the city has been invested with the power to contract for the sale of water outside of the city's corporate limits. Section 19-2701, R. R. S. 1943, provides in part: "A city of the first or second class may enter into a contract or contracts to sell * * * water * * * to persons beyond the corporate limits of such a city when, in the judgment of the mayor and council of such a city * * * it is beneficial to any such city to do so." This statute grants the power to the city of Beatrice, a city of the first class, to contract for the sale of water outside of the corporate limits of the city, but the power is permissive and creates no duty on demand to furnish water to users outside the city's limits. Section 16-681, R. R. S. 1943, provides in part that: "Such city owning, operating or maintaining its own gas, water, power, light or heat system, shall furnish any person applying therefor, along the line of its pipes, mains, wires or other conduits, subject to reasonable rules and regulations, with gas, water, power, light or heat." When construed with other sections in Chapter 16, this statute means that it is applicable to persons who are inhabitants of the city. There is nothing to indicate that a person outside the limits of the city could demand as a right the use of the water service of a city. The language quoted from section 16-681, R. R. S. 1943, was first enacted in Laws 1901, chapter 18, section 57, page 275. No different construction has been placed upon it so far as we have been able to find. We conclude therefore that water service to persons outside the corporate limits of the city are contractual and permissive, and in no sense mandatory or the result of a duty imposed by legislative action.

Every citizen has the constitutional right to acquire,

own, possess, and enjoy property. Art. I, § 25, Constitution of Nebraska. A citizen not only may acquire property, but he may sell it at such price as he can obtain in fair barter. State ex rel. English v. Ruback, 135 Neb. 335, 281 N. W. 607. His property may not be taken from him against his will except by the sovereign powers of eminent domain and taxation, both of which must be for a public purpose. The improper exercise of the power of eminent domain is an infringement upon a citizen's constitutional right to own and possess property. It is essential therefore that the exercise of the power of eminent domain be in strict accordance with its essential elements in order to protect the constitutional right of the citizen to own and possess property against an unlawful perversion of such right. The authorities are in agreement that a taking of property under the power of eminent domain must be for a public purpose and that it may not be taken for a private one. The problem sometimes arises, as it has in the instant case, as to whether or not a particular taking is for a public purpose.

It has been stated in many cases that "public use," as applied to the exercise of the power of eminent domain, is not capable of precise definition. The term is elastic and keeps pace with changing conditions. One line of decisions holds that the public use means use by the public—that is, public employment—and consequently that to make a use public, a duty must devolve on the person or corporation holding property appropriated by right of eminent domain to furnish the public with the use intended, and that there must be a right on the part of the public, or some portion of it, or some public or quasi-public agency on behalf of the public, to use the property after it is condemned. The opposing doctrine is that public use means public advantage, consequence, or benefit, and that anything which tends to enlarge the resources, increase the industrial energies, and promote the productive power of any considerable number of the inhabitants of a section of the state, or which leads

to the growth of towns and the creation of new sources for capital and labor, contributes to the general welfare and the prosperity of the whole community constitutes a public use. In any event, the character of the use, and not its extent, determines the question of public use. Where there is simply a public interest, as distinguished from a public use, the power of eminent domain cannot be exercised. 26 Am. Jur. 2d, Eminent Domain, § 27, p. 671.

The first line of decisions referred to in the preceding paragraph is based strictly on the use to which the condemned property is put, and, to make a use a public one, a duty must devolve on the person holding property appropriated by right of eminent domain to furnish the public with the public use intended in pursuance of an existing enforcible public right. In the instant case, the water sold to Phillips and Cominco is not delivered to a public service corporation, nor to a private corporation obligated to serve the public, nor subject to any right of the public to compel a public use. The usual case of a taking by eminent domain is the simple taking of private property for streets, parks, cemeteries, and for water, light, heat, and power as a public service, and other situations falling into similar classifications.

The applicable definitions of public purpose as used in connection with eminent domain proceedings necessarily mean something different in condemnations for drainage ditches, irrigation works, reservoirs, dams, and the like. The broader definition of public purpose supported by the second line of decisions does not contemplate situations such as we have in the instant case.

It cannot logically be argued that "public use," as applied to the exercise of the power of eminent domain, has a fixed definition. Increases in the population and other changing conditions require new and different applications of the power of eminent domain, but such new applications of the power must be for a public and not a private purpose. In most cases where the power

to condemn private property for public use is questioned, the facts of the particular case must be subjected to close examination.

The evidence in this case shows that the withdrawal of underground water from plaintiffs' lands was largely for the use of the Phillips and Cominco companies. The two 14-inch pipelines conveying water to Beatrice continue intact. A new 18-inch pipeline was constructed from the new well field to the point near the Phillips and Cominco plants where they were connected to the 14-inch lines with a valve control installation. A service line has been installed to service the Phillips plant and a second has been installed or will be installed to service the Cominco plant. The new 18-inch pipeline has not been extended into Beatrice although there is evidence that such an extension is contemplated some time in the future. We necessarily draw the conclusion that the water from the 4 new wells is primarily for the purpose of serving the Phillips and Cominco plants.

In our opinion, therefore, the construction of the 4 wells, the withdrawal of the ground water from plaintiffs' lands, and the construction of the 18-inch pipeline was largely for the private use of Phillips and Cominco. We do not doubt that the public interest of Beatrice is subserved by the taking, but public interest does not constitute public purpose within the meaning of the power of eminent domain. The use made of the water by Phillips and Cominco is not such as will be used by the public to such an extent as to make it a public use. Minnesota Canal & Power Co. v. Koochiching Co., 97 Minn. 429, 107 N. W. 405, 5 L. R. A. N. S. 638; Nichols v. Central Virginia Power Co., 143 Va. 405, 130 S. E. 764, 44 A. L. R. 727.

In State ex rel. Dominick v. Superior Court, 52 Wash. 196, 100 P. 317, 21 L. R. A. N. S. 448, it is said: "Does the fact that the respondent will sell and deliver a portion of its electrical power to third persons and corporations to be by them used for public and municipal light-

ing and in the operation of railroads and railways afford a sufficient reason for denying to it the right of eminent domain? We think not. Courts look to the substance rather than the form, to the end rather than to the means. If in the end the property is devoted to a public use, the mere agency or instrumentality through which that result is accomplished is a matter of no concern."

In the case before us, the end is the furnishing of water for the private purposes of Phillips and Cominco for their private use in the production of commercial fertilizers for profit. It is not even contended that its use is for any other purpose. It is undoubtedly true that the locations of the Phillips and Cominco plants at the places previously described is an asset to Beatrice. It will furnish some employment and increase business in the area, but such a public interest does not constitute a public purpose under the power of eminent domain. If it did, there would be no limit to the exercise of the power for the benefit of private enterprises and the constitutional right of the citizen to own, possess, and enjoy property would be seriously infringed by its subjection to the growing demands of industry for its needs for water for industrial use. The use put to the water by Phillips and Cominco is private and wholly within their control. It does not support a finding that its use is for such a public purpose that it warrants the encroachment of plaintiffs' constitutional rights to the ownership, possession, use, and enjoyment of their property.

We again point out that the furnishing of water for drinking and domestic uses to its inhabitants is for a public purpose under the power of eminent domain in that a city in so doing acts in its proprietary capacity as a public service corporation. In selling water outside of the limits, it is a matter of contract authorized by the Legislature, but as to which it is under no duty to provide by virtue of its status as a municipal corporation or the powers granted to it in its proprietary capacity.

There is evidence in this record that there was and is a

need on the part of Beatrice for additional water for use in emergencies, anticipated growth, and increased use by the city and its inhabitants in the future. We do not here hold that condemnation may not be proper in the fulfillment of these needs. But where a condemnation proceeding under the power of eminent domain purports to take property both for a public use and for a substantial private use as distinguished from a mere incidental private use, the right to proceed by condemnation must be denied. Minnesota Canal & Power Co. v. Koochiching Co., *supra;* Kessler v. City of Indianapolis, 199 Ind. 420, 157 N. E. 547, 53 A. L. R. 1; Shizas v. City of Detroit, 333 Mich. 44, 52 N. W. 2d 589. When the public use is separable from the private use, the court may proceed as to such public use and deny the taking and compensation for the private use. Shizas v. City of Detroit, *supra;* Kessler v. City of Indianapolis, *supra.*

It appears to us that the attempt of Beatrice to take the easements on plaintiffs' lands by eminent domain, insofar as the use by Phillips and Cominco is concerned, is an attempt to obtain private property against the will of the owners for a private purpose, even though for compensation, under the guise of an exercise of its power of eminent domain. This it cannot do. Kessler v. City of Indianapolis, *supra;* Hogue v. Port of Seattle, 54 Wash. 2d 799, 341 P. 2d 171; D. N. Kelley & Son, Inc. v. Selectmen of Fairhaven, 294 Mass. 570, 3 N. E. 2d 241.

We conclude that the taking of the easements in the instant case by the power of eminent domain as against the plaintiffs is void to the extent that it is for the private benefit of the Phillips and Cominco companies. To the extent that a need is shown for the taking for the benefit of Beatrice and its inhabitants, if such need is separable, the proceeding may be sustained. In any event, the city of Beatrice should not be permanently enjoined. The injunction, if granted, should run against the present proceeding to the extent that it is unlawful.

The judgment is reversed and the cause remanded for further proceedings consistent with this opinion.

REVERSED AND REMANDED WITH DIRECTIONS.

McCOWN and BOSLAUGH, JJ., dissenting.

Judicial interpretation of the term "public use" as applied to the doctrine of eminent domain has been referred to as one of the most controversial and conflicting areas of the law. As indicated by the majority opinion, there are at least two major lines of decision as to interpretation of the term plus another view which takes the position that the term is not susceptible of definition. Some states have adopted one doctrine or the other, and, in many instances, have, at different times, approved both of the main lines of decision as applied to individual cases. Nebraska has been cited in support of both lines of decision in one or another situation.

The majority opinion here presumably adopts the rule that "public use" means "use by the public," that is, public employment—and consequently that to make a use public, a duty must devolve on the person or corporation holding property appropriated by right of eminent domain to furnish the public with the use intended, and that there must be a right on the part of the public, or some portion of it, or some public or quasi-public agency on behalf of the public, to use the property after it is condemned. Even if this limited concept of public use is accepted, in the case where the property is held by a municipally owned public utility, its application logically should not be governed by geographic governmental property lines of the municipal corporation owning and operating the utility.

The majority opinion states that: "* * * the water sold to Phillips and Cominco is not delivered to a public service corporation, nor to a private corporation obligated to serve the public, nor subject to any right of the public to compel a public use." Here the city is itself a public service corporation, admittedly obligated to serve some segment of the public. The majority opinion

concludes that "* * * the end is the furnishing of water for the private purposes of Phillips and Cominco for their private use * * *."

Every private customer of any public utility, whether municipally owned or otherwise, buys or is furnished with the utility service for his, its, or their private use in that sense of the term. This approach assumes that the utility service furnished here by a municipally owned public utility is not furnished as a public utility, but in some separate and different capacity. It holds that some customers of a municipally owned utility are not a part of the "public" the utility is required to serve, even though such service is specifically authorized by statute and actually undertaken, and that the difference lies at the geographical boundary of the city. An important difference is apparently found in the use of the word "contract" for customers outside city limits. Each utility customer is served under a "contract" but rules, rates, and regulations constitute that "contract" in most instances. Here the evidence shows that a rate regulation was adopted by the city, and that the Phillips and Cominco contracts were within that schedule.

The majority opinion apparently concedes that if there were a duty devolving on the city requiring it to furnish water to customers in the position of Phillips and Cominco, the city would then be acting as a public utility and the taking here would be for a public use even under the limited doctrine of public use. The basis for holding that there is no duty or requirement here rests on an interpretation of section 19-2701, R. R. S. 1943, and section 16-681, R. R. S. 1943, as well as interpretation of statutes specifically granting the power of eminent domain to the city for waterworks.

The language of section 19-2701, R. R. S. 1943, that a city of the first or second class may enter into a contract or contracts to sell electric, water, or sewer service to persons beyond the corporate limits of such a city is interpreted as meaning that water service outside the cor-

porate limits of the city was intended by the Legislature to be nothing except an authorization of such service without being subject to any utilities duties, and that even when the power was exercised by a city, it did not extend the waterworks system nor require any utility service outside the corporate limits.

The majority opinion also interprets section 16-681, R. R. S. 1943, as being limited to the corporate boundaries. That section requires any city owning, operating, or maintaining its own water system to "furnish any person applying therefor, along the line of its pipes, mains, wires, or other conduits, subject to reasonable rules and regulations, with * * * water * * *." That section requires the city to regulate and fix the rental or rate and charges and install meters and regulate the fees and charges for meters. Not one word of that section limits the requirement to the city limits and, in fact, read literally, it does not even require the furnishing of such utility service to every inhabitant of the city, but only requires it along the line of the pipes, mains, or conduits, of its water system.

It should also be pointed out that section 19-2701, R. R. S. 1943, was originally section 16-685, R. R. S. 1943. As that section it has been in effect since 1909. That section used to provide that the city "shall not incur any cost or expense beyond its corporate limits in providing the means for water or sewer service, and such service shall not be instituted or continued except to the extent that the facilities of any city for supplying the service are in excess of the requirements of the inhabitants of such city." In 1957 that section was specifically amended to remove the above-quoted prohibitions and restrictions, as well as to authorize contracts for up to 25 years, and the title of the amendment specifically states those purposes.

Various other sections of the statutes clearly and specifically give the city the power of eminent domain for waterworks both inside and outside the city. See

§§ 16-674, 16-684, 19-701, R. R. S. 1943, and 19-709, R. S. Supp., 1965. At least two of these sections relate only to public utilities of cities, while the others include public utilities with other governmental functions.

The majority opinion states that the property of the companies to whom water service is being furnished is located "near the water mains located between the city of Beatrice and its existing well field." Unless section 16-681, R. R. S. 1943, be interpreted as excluding from the water system all pipes, mains, or conduits outside the city limits, Phillips and Cominco were persons who applied for and were along the line of the city's pipes, mains, and conduits.

The evidence is also undisputed that the municipal water department has many industrial and commercial users outside the city limits and also industrial users inside the city limits. It seems strange indeed to term industrial usage outside the city limits a private use while industrial use within the city limits becomes a public use where the same publicly owned and operated utility system serves both.

This court stated, as early as 1912: "Whether an undertaking is for the benefit of the people at large, and is so general in its nature that it should be regarded as a public utility, must necessarily be within the discretion of the legislature to determine, and, unless it is clearly private in its nature, the courts will not interfere with this legislative discretion. Under such circumstances, it becomes a question of ascertaining the intention of the lawmakers." Lucas v. Ashland Light, Mill & Power Co., 92 Neb. 550, 138 N. W. 761.

As this court stated in City of Curtis v. Maywood Light Co., 137 Neb. 119, 288 N. W. 503, at page 126: "On principle, it would follow that, as the business of maintaining and operating a municipal electric plant and selling current therefrom is wholly outside the truly governmental powers and functions of such city, the place of furnishing or receiving the electric current would be

in no manner controlled by the situs of the same with reference to the corporate boundaries of the cities involved in the transaction."

As this court stated in the Lucas case, *supra*: " 'But to say what a public use is with sufficient comprehensiveness and accuracy to meet the exigencies of all cases is, to say the least, difficult. Nor is it easier to define the limit of legislative power in respect to the right of eminent domain. This power must have some degree of elasticity, that it may be exercised to meet the demands of new conditions and improvements, and the ever varying and constantly increasing necessities of an advancing civilization.' "

As early as Vetter v. Broadhurst, 100 Neb. 356, 160 N. W. 109, 9 A. L. R. 578, decided in 1916, this court stated at page 358: "* * * the generally accepted doctrine is, that in order to constitute a public use the property taken must be placed within the control of the public, or of a public agency or instrumentality, and its use or the rates charged for its use be subject to public control, or it must be within the right of the public to use and enjoy."

This was followed up by the statement on page 362: "The right of eminent domain is thus held to rest on the right to control of rates by the public."

As the majority opinion here points out: "The Legislature has power over the very life of a city. It may limit or expand existing powers, or it may destroy the corporate powers of the municipality completely." The Legislature also has power to govern and control the rates for utility service which it has specifically delegated to first-class cities under section 16-681, R. R. S. 1943.

The water rights here attempted to be condemned will be owned, maintained, and operated by the municipality. The state has declared water to be a public use and its control is entirely in the hands of the Legislature. With the public ownership and development of electrical and water resources in Nebraska in the past few decades, both

inside and outside municipal limits, the time has long since passed when "public use," as applied to a municipally owned utility system, should end abruptly at the city's boundaries, and we believe the legislative intention in that respect is clear. This fact was recognized under a different statute pertaining to electricity and as to an industrial consumer in State ex rel. Dawson County Feed Products, Inc. v. Omaha Public Power Dist., 174 Neb. 350, 118 N. W. 2d 7.

For the reasons stated, we cannot agree with the majority opinion here.

SPENCER, J., concurring.

I am in full accord with the majority opinion herein, but in view of some statements in the dissenting opinion I feel that an additional statement should be made. I agree that judicial interpretation of the term "public use" as applied to the doctrine of eminent domain is a controversial and conflicting area of the law. I suggest, however, that in this case putting the most favorable construction possible on the argument of the dissenters, we still must come to the conclusion that the primary purpose of this condemnation was to take the water of plaintiffs over their protest and turn it over to two large corporations located approximately 6 miles beyond the city limits, for the production of commercial fertilizer for private profit.

The dissenting opinion quotes some dicta from Vetter v. Broadhurst, 100 Neb. 356, 160 N. W. 109, 9 A. L. R. 578, to the effect that the right of eminent domain rests on the right to control of rates by the public. The holding in that case was that the right of eminent domain cannot be exercised for a purely private purpose. That has been and is still the law of this jurisdiction.

The following language from Salisbury Land & Improvement Co. v. Commonwealth, 215 Mass. 371, 102 N. E. 619, 46 L. R. A. N. S. 1196, is very pertinent herein: "The acquisition of land under the power of eminent domain to be devoted to private uses has been recently

considered and discussed somewhat at length. It has been said that the exercise of the power of the State, either through taxation or eminent domain, to take land from one person with the intent of handing it over to another person, is not a public purpose and is contrary to basic and essential principles of free government. Opinion of the Justices, 204 Mass. 607. The underlying objection is that the main end of legislation for this purpose is a private utility rather than the general good. While incidentally it may be an advantage to the public that private persons prosper, if the essential character of the transaction in its direct object is private benefit to individuals, the purpose is not public. In a general sense it is of public interest that the people be well housed, but this does not authorize the State to become the general landlord. That subject is a proper one for the exercise of the police power but not of eminent domain. * * * Private property cannot be taken directly or indirectly for a private end. It cannot be seized ostensibly for a public use and then diverted to a private use. Legislation which is designed or which is so framed that it may be utilized to accomplish the ultimate result of placing property in the hands of one individual for private enjoyment after it has been taken from another individual avowedly for a public purpose is unconstitutional. It would enable that to be achieved by indirection which by plain statement would be impossible. These principles have been expounded at length in early decisions and recent opinions of this court with affluent citation of authorities. (Citing authorities.)"

It seems clear to me that it should not be possible to exercise the power of eminent domain when the purported public use is merely a cloak for an ulterior private use. In Burnett v. Central Nebraska Public Power & Irr. Dist., 147 Neb. 458, 23 N. W. 2d 661, we said: "In Forney v. Fremont, E. & M. V. R.R. Co., 23 Neb. 465, 36 N. W. 806, we stated as follows: 'Eminent domain is the power to take private property for public use. 1

Bouv. Law Dict., 524. It is the power which remains in the government to resume the possession of property upon making just compensation therefor, whenever the public interest requires it. This right of resumption may be exercised when required for the public good in the construction of a railroad, public road, canal, or other like work. The right of eminent domain, however, does not permit the sovereign power to take the property of one citizen and transfer it to another even for full compensation. Beekman v. Saratoga, etc. R. R. Co., 3 Paige's Ch., 73. In other words, the right of eminent domain gives to the legislature the control of private property for public uses, and for public uses only. 2 Kent's Co., 339, and cases cited. This being the rule, the property must be used for the purpose which justified its taking, otherwise it would be a fraud on the owner and an abuse of power, and the authority being in derogation of private right, is to be strictly construed.' "

The dissenting opinion argues that when property is held by a municipally owned utility, public use logically should not be governed by the geographic governmental property lines of the municipal corporation owning and operating the utility. I have no quarrel with this statement if it is confined to the sale of excess water. Here, however, the municipality is not selling excess water, but is taking private property to obtain the water it wishes to sell. I cannot agree this is for a public use, because the city apparently has ample water for city purposes. It is a mere subterfuge to obtain water for the specific benefit of two private corporations located 6 miles beyond its geographic boundaries. If it can do this for these corporations, what would prevent it from extending its jurisdiction to the far boundaries of the state? There must be a line where the right of eminent domain ends. I believe that line is properly drawn in the majority opinion. Condemnation statutes are in derogation of general right and of common law modes of

procedure, and should be strictly construed. Webber v. City of Scottsbluff, 155 Neb. 48, 50 N. W. 2d 533.

I support the view of the majority that when the Legislature delegates the power of eminent domain to a municipality, it must be used for the public use of the municipality. In providing water for domestic purposes for the city, and individual users within the city, it is serving the public purpose as such municipality. When it seeks to secure additional water to serve persons outside the corporate limits of the city, it is not serving a public purpose of the city. The fact that it is permitted to enter into contracts with persons beyond the city limits for the sale of excess water is not, as I view it, an extension of the power of condemnation to secure water in excess of the needs of the city for the purpose of the unlimited extension of its facilities.

The dissenting opinion is wholly concerned with the rights of the city, and the extension of its power to serve private industries outside of the geographical boundaries of the city. It wholly ignores the rights of the landowners whose property is being taken for purposes beyond those necessary for the use of the city and its inhabitants. Those rights in this situation are paramount.